[No. B051362. Second Dist., Div. Four. Nov. 5, 1990.]

COUNTY OF LOS ANGELES et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
ANTONIA MARTINEZ et al., Real Parties in Interest.

1448

---

## COUNSEL

Bonne, Jones, Bridges, Mueller & O'Keefe, Peter R. Osinoff, Bronislav M. Draganov, Robert W. Bates, Greines, Martin, Stein & Richland, Martin Stein, Kent L. Richland and Barbara Springer Perry for Petitioners.

No appearance for Respondent.

Emmett J. Gantz and Maureen Thomas for Real Parties in Interest.

## OPINION

**EPSTEIN, J.**—In this case we conclude that a department-wide hospital committee may satisfy the provision of Evidence Code section 1157 (section 1157) excepting proceedings and records of certain health care provider committees from discovery. We also conclude that the plaintiffs in this medical malpractice lawsuit have not established a present entitlement to discover the current medical opinion of the defendant physicians, who have not been designated as experts pursuant to Code of Civil Procedure section 2034, with respect to the medical procedures upon which plaintiffs base their lawsuit. Finally, we conclude that to the degree that the observations or opinions of these defendants are otherwise discoverable, or may become discoverable, the defendants cannot avoid testifying on the theory that they have received input from their attorneys or experts engaged by their attorneys to aid in their defense of the litigation.

### FACTUAL AND PROCEDURAL SUMMARY

Petitioners Sima D. Kahn, M.D., and Jane L. Ramp, M.D. (the physicians) and the County of Los Angeles are defendants in a pending action brought by real parties in interest Antonia Martinez, Ruben Martinez and Juana Martinez (real parties) for medical malpractice. Real parties allege that the physicians committed malpractice in attending Antonia Martinez's delivery of her daughter, Juana, on December 11, 1987, at Los Angeles County/Olive View Medical Center (Olive View). Real parties claim that Juana suffered severe brain damage as a result of oxygen deprivation during the delivery. Real parties took the depositions of Dr. Kahn, who had been the attending obstetrician, and Dr. Ramp, the resident on duty at Olive View when Antonia Martinez (Martinez) gave birth.

Two areas of dispute arose during these depositions. The first concerns the section 1157 exemption from discovery, and the second is related to the effect of Code of Civil Procedure section 2034 on real parties' right to discover present opinions about the procedures used. Each physician testified that she attended a meeting of the Olive View Department of Obstetrics after Juana was born, at which the medical chart and fetal heart moni-

toring strips generated during the childbirth were reviewed and discussed.[1] When counsel for real parties asked each physician to relate the content of the discussion at the departmental meeting about Martinez's labor and delivery, counsel for petitioners asserted the section 1157 privilege and instructed the physicians not to answer.[2]

The second dispute arose when real parties' attorney questioned the physicians about their present medical opinions regarding the symptoms exhibited during the labor and delivery. These questions were primarily focused on the physicians' current interpretation of the medical data recorded on the fetal heart monitor strips. Counsel for petitioners objected on the ground that questions eliciting the present opinions of the physicians were not reasonably calculated to lead to the discovery of admissible evidence and were asked in violation of the mandatory time frame provisions of Code of Civil Procedure section 2034. Counsel argued that since the time for designating experts pursuant to that statute had not yet arrived, the physicians had not been designated as experts and could not be deposed as such. During the deposition of Dr. Ramp, counsel also asserted that questions directed to her present opinion violated the attorney-client privilege. Counsel for petitioners did not assert the attorney work product doctrine as a basis for instructing either of the physicians not to answer deposition questions.

Real parties filed a motion to compel the physicians to answer questions in these disputed areas. In it they argued that the discussion at the meeting

---

[1] Fetal heart monitoring or tone strips record data regarding the status of the fetus. Dr. Kahn testified that both internal and external monitors were used. Hospital personnel also recorded other information on these strips.

[2] Section 1157 provides: "(a) Neither the proceedings nor the records of organized committees of medical, medical-dental, podiatric, registered dietitian, psychological, or veterinary staffs in hospitals having the responsibility of evaluation and improvement of the quality of care rendered in the hospital, or medical or dental review or dental hygienist review or chiropractic review or podiatric review or registered dietitian review or veterinary review committees of local medical, dental, dental hygienist, podiatric, dietetic, veterinary, or chiropractic societies, or psychological review committees of state or local psychological associations or societies having the responsibility of evaluation and improvement of the quality of care, shall be subject to discovery. [¶] (b) Except as hereinafter provided, no person in attendance at a meeting of any of those committees shall be required to testify as to what transpired at that meeting. [¶] (c) The prohibition relating to discovery or testimony does not apply to the statements made by any person in attendance at a meeting of any of those committees who is a party to an action or proceeding the subject matter of which was reviewed at that meeting, or to any person requesting hospital staff privileges, or in any action against an insurance carrier alleging bad faith by the carrier in refusing to accept a settlement offer within the policy limits. [¶] (d) The prohibitions in this section do not apply to medical, dental, dental hygienist, podiatric, dietetic, psychological, veterinary, or chiropractic society committees that exceed 10 percent of the membership of the society, nor to any of those committees if any person serves upon the committee when his or her own conduct or practice is being reviewed. [¶] (e) The amendments made to this section by Chapter 1081 of the Statutes of 1983, or at the 1985 portion of the 1985-86 Regular Session of the Legislature, do not exclude the discovery or use of relevant evidence in a criminal action."

of the obstetrics department was not privileged under section 1157 because the entire medical staff of the department had been asked to attend. They also asserted that Code of Civil Procedure section 2034 does not bar discovery of the present opinions of physician defendants because they are persons who *may* be named as experts at some future date. Finally, real parties argued that questions in both disputed areas were relevant to the issues of liability and credibility.

Petitioners filed opposition to the discovery motion. In a declaration submitted in support of the opposition, Dr. John Aiken stated that as director of quality assurance at Olive View in December 1987 he had presided over weekly "conferences" of the department of obstetrics, held "for the express purpose of discussing quality assurance" in the department. He testified that the objective of these conferences was to reduce morbidity and mortality. Attendance at the conferences was made up of, and limited to, physicians on the department staff, upper level obstetrics nursing personnel, the hospital quality assurance coordinator, and the hospital administrator in charge of obstetrics. Dr. Aiken also declared that he understood that the content of these conferences always had been held in strict confidence, not subject to disclosure under any circumstances.

Petitioners also relied on the deposition testimony of Dr. Kahn and Dr. Ramp regarding the meeting at which the Martinez medical chart and fetal monitor strips were reviewed. Dr. Kahn testified that while there was no formal membership for this meeting, all members of the department who were able to do so were expected to attend. Dr. Ramp testified that the conference was held within one month of the Martinez delivery, that she understood that conferences were held monthly, and that while attendance was not mandatory, "We'd come if we can." Dr. Ramp also stated that minutes were not kept, name tags were not used, and that although sign-in sheets had been used for the conferences in the recent past, she was not sure whether that procedure was used at the particular conference at which the Martinez delivery was discussed.

After several continuances, the motion to compel was heard and the trial court granted the motion in its entirety but stayed its order for 30 days. During that interval petitioners filed a petition for writ of mandate. ▆▆▆▆ We stayed the trial court's order until further order of this court, and on July 18, 1990, we issued an alternative writ.[3]

---

[3] This case falls within the principle that discovery orders requiring the revelation of allegedly privileged information may be a proper subject of review by prerogative writ. (See *Roberts* v. *Superior Court* (1973) 9 Cal.3d 330, 336 [107 Cal.Rptr. 309, 508 P.2d 309].)

## DISCUSSION

### A

*The Proceedings of the Department "Conference" Are Privileged as a Matter of Law*

Petitioners contend that the proceedings of the department's conference reviewing Martinez's medical chart and the fetal monitor strips are privileged under section 1157, which prohibits discovery of the proceedings of organized committees of medical staffs in hospitals which have the responsibility of evaluation and improvement of the quality of care rendered at the hospital. Real parties advance two reasons in support of their contention that the privilege does not apply. First, they argue that because the meeting was of the entire department and no minutes were kept, there was no "organized" committee. Second, they contend that the record lacks evidence that the department had the requisite responsibility for the evaluation and improvement of the quality of care.[4]

Section 1157 is an exception to the general doctrine mandating broad discovery. The purpose of the statute was extensively reviewed in *Matchett* v. *Superior Court* (1974) 40 Cal.App.3d 623 [115 Cal.Rptr. 317], which remains the leading case in the area. The *Matchett* court concluded that:

"Section 1157 was enacted upon the theory that external access to peer investigations conducted by staff committees stifles candor and inhibits objectivity. It evinces a legislative judgment that the quality of in-hospital medical practice will be elevated by armoring staff inquiries with a measure of confidentiality.

"This confidentiality exacts a social cost because it impairs malpractice plaintiffs' access to evidence. In a damage suit for in-hospital malpractice

---

[4] Before the trial court, real parties made a further argument, since abandoned. They contended that the section 1157 discovery exclusion is not available because the departmental meeting fell within subdivision (d) of the statute. That provision makes the discovery exclusion inapplicable to meetings of committees of certain health care "societies" where the committees include more than 10 percent of the membership of the society, or at which the health care professionals' own conduct or practice in being reviewed. Real parties' abandonment of this contention is understandable, since subdivision (d) applies only to proceedings of medical societies, and not to meetings of hospital medical staffs. (*Snell* v. *Superior Court* (1984) 158 Cal.App.3d 44, 48 [204 Cal.Rptr. 200].)

It is also well established that the exemption in section 1157, subdivision (c) for statements at a meeting by someone "who is a party to an action or proceeding the subject matter of which was reviewed at that meeting" applies to suits by physicians and other health care professionals based on wrongful exclusion from staff privileges. It does not apply to malpractice suits against the physician or a hospital. (See *Schulz* v. *Superior Court* (1977) 66 Cal.App.3d 440, 446 [136 Cal.Rptr. 67].) Real parties do not argue to the contrary.

against doctor or hospital or both, unavailability of recorded evidence of incompetence might seriously jeopardize or even prevent the plaintiff's recovery. Section 1157 represents a legislative choice between competing public concerns. It embraces the goal of medical staff candor at the cost of impairing plaintiffs' access to evidence." (40 Cal.App.3d at p. 629, fn. omitted.)

■ Thus, the purpose of section 1157 is to assure thorough evaluation of the quality of patient care by the members of the medical staff who are responsible for that review. We reject real parties' contention that the Department meeting at issue was not sufficiently formal to come within the exclusion of the statute. The record reflects that the department conducted weekly meetings at which all of the physicians on its staff, as well as the senior nursing staff and the principal hospital administrators responsible for quality assurance were requested to attend. The purpose of these meetings was to reduce morbidity and mortality—i.e., to improve patient care. While it might have been neater for the department to have required minutes and other formal organizational indicia, the statute does not require such procedures. The record reflects that the department "conferences" were meetings of a professional body organized specifically to monitor and improve health care in the obstetrics department. There is no evidence to the contrary.

Nor does the presence of the nurses and administrators at the weekly meetings of the department alter this result. The court in *Santa Rosa Memorial Hospital* v. *Superior Court* (1985) 174 Cal.App.3d 711, 718 [220 Cal.Rptr. 236] held that the participation of hospital staff who are not physicians in a committee meeting does not preclude the application of section 1157. In so ruling, the court looked to the California Administrative Code sections regulating licensing and certification of acute care hospitals.[5]

The administrative regulations mandate evaluation of patient care by the appropriate bodies of the hospital professional staff. Title 22, California Code of Regulations, section 70701, subdivision (a)(1)(F) provides for periodic reviews based on the medical records of patients: "Self-government by the medical staff with respect to the professional work performed in the hospital, periodic meetings of the medical staff to review and analyze at regular intervals their clinical experience and requirement that the medical records of the patients shall be the basis for such review and analysis." The activities of the Olive View departmental conference follow this mandate precisely.

---

[5] All references to this code are under its new designation adopted by the Legislature to be effective January 1, 1988, i.e., the California Code of Regulations.

In *Matchett* v. *Superior Court, supra,* 40 Cal.App.3d 623, the court applied section 1157 to the proceedings of a tissue committee which the court found to be part of the hospital's program for peer group evaluation of medical, surgical and obstetrical activities, including evaluation of preoperative and postoperative diagnosis. (*Id.* at pp. 630-631.) The *Matchett* court took judicial notice of portions of the Accreditation Manual for Hospitals by the Joint Commission on Accredited Hospitals. As requested by petitioners, we take judicial notice of the portions of the 1987 and 1988 Accreditation Manual regarding quality assurance (QA.). Those standards expressly provide a role of a hospital department in patient care quality assurance. For example, QA.3.1, calls for "ongoing collection and/or screening of, and evaluation of information about, important aspects of patient care to identify opportunities for improving care and to identify problems that have an impact on patient care and clinical performance." QA.3.1.1 envisages that such information be "collected and/or screened by a department/service or through the overall quality assurance program." (Accreditation Manual for Hospitals, 1987, p. 217.)

There is no reason why a continuing professional body, charged with this responsibility and organized as the department of obstetrics conferences were in this case cannot constitute the "committee" referenced in section 1157.[6] The statute includes no requirement that the committee consist of only some of the physicians who are members of the department's staff rather than all of them. Indeed, section 1157 makes no reference to "departments" at all. Rather, the portion of the statute pertinent to this case—the first part of subdivision (a)—refers to committees of hospitals. So long as the statutory purpose of peer professional evaluation and improvement of the quality of patient care is served, as the undisputed evidence shows that it was in this case, the specific composition of the reviewing body is best left to the health care professionals.

B

*Discovery of the Present Opinions of Defendant Physicians Not Yet Designated as Experts Is Not Authorized*

Petitioners claim that the present opinions of the physicians regarding the fetal monitor strips are not relevant until and unless the physicians are designated as expert witnesses. Petitioners argue that real parties are barred

---

[6]See *Mt. Diablo Hospital Dist.* v. *Superior Court* (1986) 183 Cal.App.3d 30, 33, footnote 2 [227 Cal.Rptr. 790], in which the court recognizes that it is the function of the reviewing body, not its title as a "committee" or "department," that is determinative for purposes of the statute.

from this inquiry because the physician defendants have not been designated as defense experts under Code of Civil Procedure section 2034, nor has statutory time run within which expert witnesses must be designated under that statute. Real parties contend that section 2034[7] does not apply because the questions at issue in this proceeding did not seek to elicit the opinions or impressions of the physicians regarding the standard of practice or any defenses they might raise.

■ In a malpractice action, the defendant himself or herself may provide the expert testimony which establishes plaintiff's prima facie case. (*Robinson* v. *Pediatric Affiliates Medical Group, Inc.* (1979) 98 Cal.App.3d 907, 910 [159 Cal.Rptr. 791].) However, the present expert opinions of a party physician concerning the care given are irrelevant unless the physician is designated as an expert witness. In *Scarano* v. *Schnoor* (1958) 158 Cal.App.2d 612 [323 P.2d 178], a medical malpractice case involving eye surgery, the court held that the trial court properly sustained objections to questions asked of a defendant physician as to whether he would perform the same surgery on plaintiff's other eye on the basis of what he knew immediately after the operation. "The circumstances to be considered in deciding defendant's negligence 'are those which the evidence shows may reasonably be supposed to have been known to such person and to have influenced his mind and actions at the time.' [Citation.] Negligence is not to be determined by hindsight nor by what a party subsequently learns." (158 Cal.App.2d at p. 622.)

Questions to the defendant physicians about their impressions and reasons for their action or lack of action at the time the medical procedure was

[7]Section 2034 provides in pertinent part: "(a) After the setting of the initial trial date for the action, any party may obtain discovery by demanding that all parties simultaneously exchange information concerning each other's expert trial witnesses to the following extent: [¶] (1) Any party may demand a mutual and simultaneous exchange by all parties of a list containing the name and address of any natural person, *including one who is a party*, whose oral or deposition testimony in the form of an expert opinion any party expects to offer in evidence at the trial . . . . [¶] (b) Any party may make a demand for an exchange of information concerning expert trial witnesses without leave of court. A party shall make this demand no later than the 10th day after the initial trial date has been set, or 70 days before that trial date, whichever is closer to the trial date. [¶] (c) . . . . [¶] The demand shall specify the date for the exchange of lists of expert trial witnesses, expert witness declarations, and any demanded production of writings. The specified date of exchange shall be 50 days before the initial trial date, or 20 days after service of the demand, whichever is closer to the trial date, *unless the court, on motion and a showing of good cause, orders an earlier or later date of exchange.* . . . [¶] . . . [¶] (i) On receipt of an expert witness list from a party, any other party may take the deposition of any person on the list . . . . [¶] (2) A party desiring (A) to depose any expert described in paragraph (2) of subdivision (a) *except one who is a party* . . . shall pay the reasonable and customary hourly or daily fee for the actual time consumed in the examination of that expert by any party attending the deposition . . . ." (Italics added.)

performed are, of course, entirely appropriate. Such questions were asked without objection by defense counsel. But, as the *Scarano* case makes clear, questions about after-the-fact opinions and impressions of the physicians stand in quite another light.

The only argument presented to justify that inquiry is that the physicians might be designated as defense experts on the propriety of the procedures used in the delivery. Should they be so designated, a full inquiry into their present opinions would be entirely appropriate. But as we next discuss, the inquiry is not appropriate until and unless there is such a designation.

Code of Civil Procedure section 2034 prescribes a detailed legislative scheme for discovery of expert witnesses, including parties. It establishes the times and conditions for such discovery. Petitioners and real parties agree that no request for exchange of information concerning expert witnesses had been served. Section 2034, subdivision (i) provides that expert witnesses may be deposed only on receipt of an expert witness list. Subdivision (b) of section 2034 bars the parties from serving such a notice until either 70 days before the initial trial date or 10 days after the trial date is set, whichever is closer to the trial date.

The legislative intent behind this statutory time frame was examined in *St. Vincent Medical Center* v. *Superior Court* (1984) 160 Cal.App.3d 1030 [206 Cal.Rptr. 840], a medical malpractice action decided before the Civil Discovery Act of 1986. In *St. Vincent*, the trial court had shortened the time within which the parties were to serve demands to exchange information regarding their experts pursuant to former Code of Civil Procedure section 2037, which then governed such discovery. Then, as now, a demand for designation of experts could be served not later than the 10th day after the trial date is selected, and not earlier than 70 days prior to the date set for trial.[8] The *St. Vincent* court noted that the statute treats the time for service of the demand for expert information differently than the time for the actual exchange of information. While courts are expressly authorized to shorten the time for the actual exchange of information after a demand has been served, they may only extend, and cannot shorten, the time for service of the demand itself. (*Id.* at p. 1033.) The Civil Discovery Act of 1986 continues to expressly provide that the court may reduce only the time for the date of exchange of the expert information, not the time for the service of the demand for exchange. (§ 2034, subds. (b) and (c).) This distinction is logical because service of the demand is the triggering step for the exchange of information about expert witnesses.

---

[8] In 1988, Code of Civil Procedure section 2034 was amended to clarify that these times run from the initial date set for trial.

In his treatise, 2 Modern California Discovery (4th ed. 1988) section 13.12, pages 250-251, Professor James E. Hogan identifies four reasons for strictly controlling pretrial discovery of expert opinion: "In the first place, access to the conclusions of an adversary's experts often provides strong clues to the theories, thoughts, and tactics of opposing counsel, . . . [¶] Second, a limitless right to ascertain and probe the views of opposing experts could easily lead to an expensive and delay-producing round of discovery that would tend to feed on itself: . . . [¶] Third, unrestricted discovery as to an adversary's experts enables 'the stupid or lazy practitioners' to sit back secure in the knowledge that at the appropriate time they will be able 'to "ride free" on the opponent's industry.' Since 1963, recognition of this 'free ride' as a discovery evil has been articulated in the Discovery Act itself: 'It is the policy of the state . . . to prevent attorneys from taking undue advantage of their adversary's industry and efforts.' Finally, . . . discovery as of right with respect to an adversary's experts is bound to have the dreaded 'chilling effect' on the willingness of attorneys to use objective, fair-minded consultants who will honestly and frankly point out the weaknesses and deficiencies of their side." (Fn. omitted) (See also *South Tahoe Public Utility Dist.* v. *Superior Court* (1979) 90 Cal.App.3d 135, 138 [154 Cal.Rptr. 1]: "Were the names of the experts here released *prior* to each party's preparation for trial, full investigation of the factual circumstances would be discouraged and there is a substantial likelihood that real party in interest would be able to determine its strategy at trial without independent effort on its part and would be able to base its efforts solely on petitioner's selection of experts.") (Italics in original.)

As we have seen, Code of Civil Procedure section 2034 is expressly applicable to the expert opinion of parties to a lawsuit. We see no reason to disrupt the carefully crafted legislative scheme for the regulation of discovery of the identity, qualifications and opinions of expert witnesses. The trial court order that the physician defendants testify at deposition about their present opinion of the medical propriety of their acts, even though they have not been designated as expert witnesses, would have that effect. It is for that reason that we direct that it be set aside.

## C

*Petitioners Have Not Carried Their Burden of Establishing That the Current Opinions of the Physicians Are Protected From Discovery by the Attorney-Client Privilege and the Work-Product Doctrine*

Petitioners also argue that deposition questions to the physician parties seeking their present opinions about the medical procedures used in the

Martinez delivery are objectionable because they seek to compel evidence that is protected by the attorney-client privilege and the work-product doctrine.

In support of this position, petitioners argue that a copy of the fetal heart tracing was transmitted to each physician "well in advance" of the depositions to establish a framework for the defense by allowing each of the physicians to refamiliarize herself with the facts. Counsel then discussed the tracings with each defendant physician, inquiring into the physician's present opinions to determine whether each physician would be a candidate for expert testimony on her own behalf and to educate the attorneys for petitioners. Each physician received correspondence from her attorneys summarizing the opinions of other defense experts, including the impressions and thought processes of counsel.[9]

 At oral argument, real parties' counsel conceded that once a defendant physician is designated as an expert for trial, if that should occur, her present and previous opinion about the medical procedures at issue in the malpractice action would be proper subjects of discovery, notwithstanding any communications she may have had with counsel, retained experts, or the other defendant physician. This concession is appropriate, since it is well established that knowledge possessed by a witness does not become privileged merely because it is communicated to an attorney. (*S. F. Unified Sch. Dist.* v. *Superior Court* (1961) 55 Cal.2d 451, 457 [11 Cal.Rptr. 373, 359 P.2d 925, 82 A.L.R.2d 1156] [attorney-client]; *Grand Lake Drive In* v. *Superior Court* (1960) 179 Cal.App.2d 122, 127 [3 Cal.Rptr. 621] [attorney-client]; *National Steel Products Co.* v. *Superior Court* (1985) 164 Cal.App.3d 476, 488 [210 Cal.Rptr. 535] [work-product] and see Friedenthal, *Discovery and Use of an Adverse Party's Expert Information* (1962) 14 Stan.L.Rev. 455, 469.) It is also dispositive of the issue.

---

[9] We note that petitioners failed to assert the work product doctrine at either deposition, as required by Code of Civil Procedure section 2025, subdivision (m)(1). We also note that the attorney-client privilege was not asserted during the deposition of Dr. Kahn in response to real parties' questions concerning her present medical opinions. Real parties did not raise the issue of waiver either before the trial court or on appeal. Petitioners have consistently pressed their arguments about privilege, which both sides have thoroughly briefed. In light of this history, we consider the issues on their merits. (See *BP Alaska Exploration, Inc.* v. *Superior Court* (1988) 199 Cal.App.3d 1240, 1252 [245 Cal.Rptr. 682].)

## DISPOSITION

Let a peremptory writ of mandate issue directing the respondent court to vacate its July 8, 1990, order compelling petitioners to answer the deposition questions which were the subject of real parties' motion to compel.

Woods (W. A.), P. J., and Goertzen, J., concurred.