Filed 10/25/22  Abelar v. Mora CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DEE ANN ABELAR et al., | B311451 |
| Plaintiffs and Appellants, | Los Angeles County |
| v. | Super. Ct. No. BC641637 |
| JEFFREY MORA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis A. Kin, Judge. Affirmed.

Gary Rand & Suzanne E. Rand-Lewis and Suzanne E. Rand-Lewis for Plaintiffs and Appellants.

Bonne, Bridges, Mueller, O'Keefe & Nichols, Mitzie L. Dobson and Michael K. Liu for Defendant and Respondent.

# INTRODUCTION

This is a medical malpractice and loss of consortium action brought by plaintiffs and appellants Dee Ann Abelar and her husband Brian Abelar (plaintiffs)[1] against, as pertinent here, defendant and respondent Jeffrey Mora, M.D.[2] Plaintiffs appeal from a judgment entered after summary judgment in Mora's favor.

Approximately six weeks after Dee Ann underwent a craniotomy, she began experiencing neurological symptoms including seizures. She was treated by Mora, a neurologist, as well as several other physicians at a local hospital. Eventually, Dee Ann was transferred to USC Keck Medical Center. There, doctors discovered an infection. Plaintiffs contend Mora, among others, negligently failed to diagnose and treat the infection.

Mora moved for summary judgment and supported his motion with a declaration by an expert neurologist who opined that Mora's treatment met the standard of care and did not cause or contribute to the infection. Plaintiffs opposed the motion and supported it with a declaration by a general surgeon, Dr. Leslie Rand-Luby. Mora moved to depose Dr. Rand-Luby concerning the foundation for her stated opinions and the court granted the motion. An extended law and motion battle ensued. The court issued two orders compelling plaintiffs to produce Dr. Rand-Luby

---

[1] Because plaintiffs have the same last name, we refer to the Abelars by their first names in describing the facts of the case. No disrespect is intended.

[2] Although Mora is a physician, we refer to him throughout our opinion by his last name only. We reserve the use of the honorific, "Dr. _____," for the medical experts. No disrespect is intended.

for a limited-scope deposition, but they refused to do so. Eventually, after finding that plaintiffs and their counsel filed a frivolous second motion for a protective order, the court imposed an evidentiary sanction striking Dr. Rand-Luby's declaration. The court subsequently granted Mora's motion for summary judgment, entered judgment in his favor, and awarded costs including expert witness fees.

Plaintiffs contend the court erred by ordering Dr. Rand-Luby's deposition, striking her declaration as an evidentiary sanction, granting the motion for summary judgment, and denying their motion to tax costs in part. Finding no error, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1.    General Background

Plaintiffs filed this medical malpractice action against numerous physicians, their associated medical corporations, and several hospitals in December 2016. As pertinent here, the complaint states causes of action for professional negligence and loss of consortium against Mora.[3]

According to the complaint, Dee Ann underwent a craniotomy on October 6, 2015, to remove a meningioma that had been compressing her optic nerve. She was discharged from the hospital two days after the surgery.

---

[3] The complaint includes eight causes of action. All but two of those were resolved in favor of Mora pursuant to a successful demurrer by another physician defendant and a stipulation between plaintiffs and the remaining physician defendants.

On November 20, 2015, Dee Ann suffered a grand mal seizure and was briefly admitted to the emergency department at a local hospital. Dee Ann continued to experience seizures and other neurological symptoms and was admitted to the local hospital on November 30, 2015. There, she was treated by several physicians including Mora. Plaintiffs allege Mora told them that the local hospital "did not have the specialist care or facilities necessary to properly diagnose or treat" Dee Ann and recommended that Brian transfer Dee Ann to another hospital. Dee Ann remained hospitalized until she was transferred to USC Keck Medical Center on December 11, 2015. There, doctors performed a second craniotomy during which portions of Dee Ann's brain and skull were removed. An infection was definitively diagnosed on December 19, 2015.

With respect to the professional negligence claim, plaintiffs contend Dee Ann was suffering from an infection during the time Mora was treating her. They allege that Mora's failure to diagnose and treat the infection fell below the standard of care and that his actions caused or contributed to her injuries. Plaintiffs also assert a claim for loss of consortium as to Dee Ann's husband, Brian.

2. **October 2019 to January 2020: Motion for Summary Judgment and Opposition**

Mora filed a motion for summary judgment in October 2019. With respect to the professional negligence claim, Mora asserted plaintiffs would be unable to establish that he breached the standard of care or that any action or inaction by Mora caused plaintiffs' alleged injuries. The motion was supported by a declaration by Dr. Michael Gold, an expert in neurology. Dr. Gold reviewed Dee Ann's medical records and

opined that Mora met the standard of care at all times while treating Dee Ann and that no act or omission by Mora caused or contributed to her subsequently-diagnosed infection. Mora also argued that because Dee Ann's negligence claim failed, the loss of consortium claim necessarily failed.

Plaintiffs opposed the motion, generally arguing that there were triable issues of fact as to whether Dee Ann was suffering from an infection during the time Mora was treating her. Plaintiffs' medical expert, Dr. Rand-Luby, is a general surgeon and she opined that the medical records show Dee Ann was suffering from an infection while Mora treated her and that Mora's failure to diagnose and treat the infection failed to meet the standard of care. Plaintiffs also contended that Mora's medical expert failed to provide a medical opinion sufficient to shift the burden of production to them.

Mora immediately served a notice of deposition of Dr. Rand-Luby to be held on the earliest possible noticed date, January 28, 2020.

### 3. January 2020: Mora's Application to Conduct a Limited-Scope Deposition of Plaintiffs' Medical Expert; Plaintiffs' Motion for a Protective Order

On January 16, 2020, Mora filed an ex parte application seeking to continue the motion for summary judgment. Mora asked for the continuance and an order allowing him to depose Dr. Rand-Luby regarding the foundation of her medical opinions pursuant to *St. Mary Medical Center v. Superior Court* (1996) 50 Cal.App.4th 1531 (*St. Mary*).[4] Mora raised numerous concerns

---

[4] The appellate court held that a party may conduct a limited-scope deposition of an expert who submits a declaration in support of or in

5

regarding Dr. Rand-Luby's qualification to opine on the standard of care for a neurologist given that she is a general surgeon with apparent specialties in breast and advanced laparoscopic surgeries. Further, Dr. Rand-Luby stated that she had treated "conditions" and "problems" like those suffered by Dee Ann but was not specific about the nature of the "conditions" and "problems" to which she referred. Mora also questioned a variety of other statements made by Dr. Rand-Luby which appeared to be without sufficient foundation. Plaintiffs opposed the ex parte application on myriad grounds and requested monetary sanctions against Mora and his counsel.

On January 17, 2020, the court granted Mora's ex parte request to depose Dr. Rand-Luby and continued the motion for summary judgment. Nevertheless, on January 24, 2020, plaintiffs served objections to Mora's deposition notice asserting, among other things, that the deposition was not proper under *St. Mary*. And on January 28, 2020, the day of the scheduled deposition, plaintiffs filed a motion for a protective order seeking to quash the deposition notice for Dr. Rand-Luby, again claiming that the deposition was not proper under *St. Mary*. In response, Mora filed a motion to compel the deposition of Dr. Rand-Luby and to specially set the date of the deposition on March 24, 2020.

The parties stipulated that both motions would be heard on March 13, 2020.

---

opposition to a motion for summary judgment if there is a legitimate question regarding the foundation of the expert's opinion. (*St. Mary, supra*, 50 Cal.App.4th at p. 1539.)

### 4. March 2020: The Court Grants Mora's Motion to Compel the Deposition of Dr. Rand-Luby

On March 13, 2020, the court heard arguments on the motion to compel the deposition of Dr. Rand-Luby and the motion for a protective order. The court issued a written ruling granting Mora's motion to compel. The court rejected plaintiffs' argument that no good cause existed to depose their expert under *St. Mary* as well as their other numerous arguments. The court denied plaintiffs' motion for a protective order and ordered the deposition to occur on March 24, 2020 at 10:00 a.m.

### 5. Mid-2020: Pandemic-Related Delays

Due to the Covid-19 pandemic, the deposition did not take place as scheduled and the court continued the motion for summary judgment to mid-July 2020 and then to late October 2020. On June 30, 2020, the court ordered plaintiffs to produce Dr. Rand-Luby for her deposition no later than September 16, 2020. For Dr. Rand-Luby's convenience, Mora agreed to take her deposition on September 24, 2020.

### 6. September 2020: Plaintiffs' Second Motion for Protective Order to Prohibit Mora from Deposing Dr. Rand-Luby

On September 22, 2020, two days before Dr. Rand-Luby's long-awaited deposition was scheduled to take place, plaintiffs filed a second motion for a protective order seeking to prevent Mora from deposing Dr. Rand-Luby. The hearing was noticed for December 11, 2020. Plaintiffs advised Mora that Dr. Rand-Luby would not appear for her deposition on September 24, 2020, and she did not.

Plaintiffs' motion requested the following orders from the trial court: that Dr. Rand-Luby's deposition last no longer than two hours; that the scope of the deposition be limited to questions regarding the foundation of her opinions stated in her declaration; that the logistics of the deposition, including the video link, details regarding exhibits, and the location of the reporter, be provided to plaintiffs' counsel at least seven days prior to the deposition; that Dr. Rand-Luby not be required to produce any documents at the deposition and that Mora would not be permitted to adjourn the deposition in order to compel the production of documents; and that Mora pay Dr. Rand-Luby's fees at least seven business days prior to the date of the deposition. Plaintiffs also demanded an order compelling the deposition of Mora's medical expert, Dr. Gold.

The motion for a protective order claimed that Mora's "improper deposition notice falsely claims the deposition is pursuant to *St. Mary* … when in actuality [he] intends to conduct a complete expert witness deposition of Dr. Rand-Luby" in violation of Code of Civil Procedure section 2034.410, et seq.[5] Further, and with respect to the production of documents by Dr. Rand-Luby, plaintiffs admitted that Mora agreed to " 'move forward' " with the deposition without the production of documents but they objected that Mora "failed and refused to confirm that he will not adjourn the deposition and seek an order compelling production of documents." Plaintiffs also complained that the logistics of the deposition, which would be held remotely, had not been fully disclosed.

---

[5] All undesignated statutory references are to the Code of Civil Procedure.

8

On the issue of expert witness fees, plaintiffs insisted that Mora refused to pay Dr. Rand-Luby's expert witness fees: "Instead, on September 21, 2020, for the first time, and a mere three (3) days before the scheduled deposition, defense counsel demanded Dr. Rand-Luby provide a completed W-9 form, including her social security number, to an unknown secretary at defense counsel's office before her witness fees would be paid." Thus, plaintiffs urged, it was Mora's fault that the deposition would not take place as scheduled: "Defense counsel's refusal to tender Dr. Rand-Luby's fees in a timely manner, and demand three (3) days before the scheduled deposition for a W-9 form before those fees would be paid, leaves Dr. Rand-Luby in the position of having to cancel surgeries on short notice which is highly prejudicial to both Dr. Rand-Luby and to her patients. Moreover, because the deposition was not confirmed by timely payment of fees, Dr. Rand-Luby has surgeries and other patient consultations scheduled such that she will have been working in excess of twenty[-]four (24) hours straight before the deposition commences. Defendant Mora's failure to timely tender fees so as to ensure that Dr. Rand-Luby could block the time for her deposition without the potential of losing a complete day's earnings has caused unwarranted annoyance, oppression, and undue burden to Dr. Rand-Luby."[6]

---

[6] Mora agreed to pay Dr. Rand-Luby for two hours at a rate of $990 per hour in advance of the deposition. The check was delivered to plaintiffs' counsel's office on the morning of September 22, 2020.

### 7. September 2020: Mora's Application to Specially Set the Deposition of Dr. Rand-Luby and Request for Sanctions; Order to Show Cause Regarding Sanctions

On September 30, 2020, and in response to plaintiffs' refusal to produce Dr. Rand-Luby for her deposition as scheduled, Mora filed an ex parte application again seeking an order specially setting Dr. Rand-Luby's deposition and seeking monetary, evidentiary, and terminating sanctions under section 2023.030. Mora asserted that counsel for the parties met and conferred on September 21, 2020, and had resolved all of plaintiffs' concerns about the deposition. Yet plaintiffs filed their motion for a protective order the next day, raising issues that had already been agreed upon, including the payment of expert witness fees in advance of the deposition. Mora recounted plaintiffs' repeated refusal to produce Dr. Rand-Luby for deposition despite the court's orders that they do so and requested that the court specially set a date and time for the deposition.

Mora also asserted that plaintiffs' second motion for a protective order was frivolous and made in bad faith because it rehashed arguments that had already been rejected by the court and raised issues that had already been settled informally by counsel. Accordingly, Mora requested that the court sanction plaintiffs and their counsel for misuse of the discovery process.

Plaintiffs opposed the ex parte application, arguing that Mora's application was "a bad faith attempt to avoid the Court's hearing of, and ruling on, Plaintiffs' pending Motion for Protective Order." Plaintiffs reasserted the arguments presented in their second motion for a protective order and demanded

monetary sanctions against Mora and his counsel "for bringing this patently frivolous application."

On October 1, 2020, the court heard Mora's ex parte application, which it granted in part. The court advanced the hearing on plaintiffs' second motion for a protective order to October 23, 2020, and set an order to show cause for the same day "as to why Plaintiff[s] and their counsel should not be sanctioned for failure to comply with the Court's orders of 06/30/2020 and 03/13/2020. Sanctions to be imposed may be monetary and/or by striking the declaration[ ] of Dr. Leslie Rand-Luby, M.D. and/or by dismissing Plaintiff[s'] claims against [Mora]."

## 8.  October 2020: Second Request for Protective Order Denied; Sanctions Imposed

On October 26, 2020, the court heard argument on and denied plaintiffs' second motion for a protective order. In its written order, the court recounted plaintiffs' history of refusing to produce Dr. Rand-Luby for deposition, notwithstanding two orders compelling the deposition. As to the merits, the court reviewed plaintiffs' arguments and concluded each of them lacked merit. For example, plaintiffs claimed that Mora intended to take a "premature expert deposition" but no evidence before the court supported that contention and, in any event, the court's orders compelling the deposition limited the permissible scope. Regarding plaintiffs' demands for logistical information and payment of expert fees seven days before the deposition, the court noted that no rule or statute required Mora to do so and, in any event, Mora had paid for two hours of Dr. Rand-Luby's time two days prior to the deposition. The court also rejected plaintiffs' unilateral demand to limit the deposition to two hours as without

11

any legal basis. And, the court noted, several of plaintiffs' arguments had been resolved prior to their filing of the second motion for a protective order. Accordingly, the court not only denied the motion but concluded it was "entirely frivolous." "Indeed, the timing of the motion and the unmeritorious positions asserted therein lead to but one conclusion—that plaintiffs made the motion in bad faith and as subterfuge for their apparent strategic decision to avoid the court-ordered deposition of Dr. Rand-Luby."

The court also imposed monetary and evidentiary sanctions. The court acknowledged that the Covid-19 pandemic and Dr. Rand-Luby's "noble service as a healthcare professional during these uncertain times" had required some delay in the taking of her deposition. But Mora had been more than accommodating in that regard, "only to be met by plaintiffs' delay and unsupported excuses for avoiding the court-ordered deposition, culminating in the instant bad-faith motion for a protective order. Indeed, even after the Court issued its Order to Show Cause on October 1, 2020, plaintiffs persisted in their unsupported position regarding the conditions under which they would produce Dr. Rand-Luby, which, in context, the Court views as plaintiffs['] attempt to appear as if attempting to comply with this Court's orders, as opposed to making a genuine, good faith effort to be in compliance." Accordingly, the court found that plaintiffs failed to show cause why "an appropriately tailored evidence sanction" should not be imposed. Due to plaintiffs' refusal to produce Dr. Rand-Luby for deposition and their bad faith in bringing the second motion for a protective order, the court struck the declaration of Dr. Rand-Luby submitted in opposition to Mora's motion for summary judgment. The court

12

also imposed a monetary sanction of $1,600, jointly and severally against plaintiffs and their counsel.

## 9. Summary Judgment

On November 20, 2020, the court heard argument on and granted Mora's motion for summary judgment. Specifically, the court found that the declaration of Dr. Gold, who was a qualified expert, established that Mora had no reason to suspect that Dee Ann was suffering from an infection while she was under his care. According to Dr. Gold, Mora ordered the proper laboratory and imaging studies and prescribed appropriate medication to treat Dee Ann's seizures. And in light of the clinical evidence, Mora had no reason to suspect the presence of an infection. Accordingly, the court found that Mora's evidence shifted the burden to plaintiffs to show the existence of a triable issue of material fact. But because the court struck Dr. Rand-Luby's declaration as an evidentiary sanction, plaintiffs failed to provide admissible expert testimony in opposition to Mora's motion. The court concluded plaintiffs failed to show the existence of triable issues of material fact as to the medical negligence claim. And because that claim failed, Brian's loss of consortium claim also failed as a matter of law.

## 10. Judgment for Mora; Appeal

The court entered judgment in favor of Mora on December 15, 2020, including an award of costs "in such sum as is reflected in Defendant's cost memorandum." Plaintiffs timely appealed from the judgment.

13

## 11.    Cost Award

Mora filed his cost memorandum seeking costs of $13,978.63, including expert witness fees of $8,637.33. Plaintiffs moved to tax most of the items in Mora's cost bill, arguing variously that the costs were not allowed, were unreasonably high, or were not necessary to the litigation. As to the expert witness fees claimed as costs under section 998, plaintiffs asserted that Mora failed to provide a copy of a written settlement offer in support of his cost memorandum and was therefore not entitled to recover expert witness fees. Without conceding that they had received settlement offers in the first instance, plaintiffs also urged that any settlement offers were premature, unreasonable, and in bad faith. In reply, Mora explained that he had attempted to settle with each of the plaintiffs in May 2019 by offering to waive costs in exchange for a dismissal with prejudice. Mora also conceded that several items listed on the cost memorandum were not recoverable and withdrew his request for costs as to those items.

The court granted the motion to tax costs in part, eliminating costs of $420 (concededly already paid by plaintiffs), $60 (a filing fee not necessary to the litigation), and $15 (an item for which Mora lacked a receipt.) The court eliminated another $630 in costs, concluding those costs were also not necessary to the litigation. The court awarded the remaining cost items and entered an amended judgment to that effect.

### DISCUSSION

Plaintiffs make the following arguments: (1) the court abused its discretion by ordering a deposition of plaintiffs' medical expert, Dr. Rand-Luby; (2) the court further abused its

14

discretion by striking the declaration of Dr. Rand-Luby as an evidentiary sanction; (3) the court erred by granting Mora's motion for summary judgment; (4) the court also erred by awarding certain items included in Mora's cost bill. We address these issues in turn.

## 1. Appealability

As an initial matter, we address Mora's assertion that several of plaintiffs' arguments are not properly before us. As Mora notes, the notice of appeal states only that plaintiffs appeal from a December 15, 2020 judgment after an order granting summary judgment. More to the point, according to Mora, the notice of appeal does not list the other orders plaintiffs challenge here: the court's orders regarding Dr. Rand-Luby's deposition and the postjudgment order fixing the amount of Mora's costs. Mora urges us to construe the notice of appeal in a manner that limits our review to the propriety of the court's order granting Mora's motion for summary judgment. We decline to do so.

It is well-established that most discovery-related orders, such as the orders at issue here, are not directly appealable and may be challenged on appeal from the final judgment. (See, e.g., *O&C Creditors Group, LLC v. Stephens & Stephens XII, LLC* (2019) 42 Cal.App.5th 546, 561 ["Discovery orders are not directly appealable, and even writ review of such orders is limited; instead, they are generally challenged by appeal from the final judgment."]; *Nickell v. Matlock* (2012) 206 Cal.App.4th 934, 940 ["An order granting terminating sanctions is not appealable, and the losing party must await the entry of the order of dismissal or judgment *unless* the terminating order is inextricably intertwined with another, appealable order."]; *Doe v. United States Swimming, Inc.* (2011) 200 Cal.App.4th 1424, 1432 ["There

is no statutory provision for appeal from an order compelling compliance with a discovery order."].) Accordingly, plaintiffs' challenges to the court's orders requiring the deposition of Dr. Rand-Luby, denying their motions for a protective order, and imposing evidentiary sanctions are proper.

Further, where, as here, "a judgment awards costs and fees to a prevailing party and provides for the later determination of the amounts, the notice of appeal subsumes any later order setting the amounts of the award." (*Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993, 998; *DeZerega v. Meggs* (2000) 83 Cal.App.4th 28, 44; and see Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2022) ¶ 2:156.2 ["Where a judgment awards unspecified costs and attorney fees and provides for later determination of the amount, the failure to file a separate appeal from the subsequent order fixing the amount of costs and fees does not preclude review of the order on appeal from the underlying judgment."], italics omitted.) A separate appeal from the order setting the amount of the costs is permitted, but not required.

## 2. The court did not abuse its discretion by ordering a limited-scope deposition of plaintiffs' medical expert, Dr. Rand-Luby.

### 2.1. Standard of Review

We review the order granting Mora's request to take the deposition of Dr. Rand-Luby for an abuse of discretion. (*St. Mary, supra,* 50 Cal.App.4th at p. 1540 ["Whether to grant discovery in a given case falls within the sound discretion of the trial court based upon all of the facts presented."].) The same standard of review applies to the denial of a motion for a protective order. (See *People ex rel. Harris v. Sarpas* (2014) 225 Cal.App.4th 1539,

16

1552 [stating standard of review for the denial of a discovery-related protective order is abuse of discretion].) " ' "Management of discovery lies within the sound discretion of the trial court. Consequently, appellate review of discovery rulings is governed by the abuse of discretion standard. [Citation.] Where there is a basis for the trial court's ruling and the evidence supports it, a reviewing court will not substitute its opinion for that of the trial court. [Citation.]" [Citation.] The trial court's determination will be set aside only when it has been established that there was no legal justification for the order granting or denying the discovery in question.' " (*O&C Creditors Group, LLC v. Stephens & Stephens XII, LLC*, *supra*, 42 Cal.App.5th at p. 561.)

### 2.2. Legal Principles

To determine whether the court abused its discretion by allowing Mora to depose Dr. Rand-Luby, we look to *St. Mary, supra*, 50 Cal.App.4th 1531. In that case, as here, the defendant moved for summary judgment and the plaintiff responded by producing the declaration of a medical expert who had not been previously identified as an expert. (*Id*. at pp. 1534–1535.) When the defendant attempted to take its motion off calendar and depose the expert, the plaintiff objected, arguing the expert could not be deposed until the parties exchanged expert witness lists pursuant to former section 2034. (*St. Mary*, at p. 1535; § 2034 was repealed by Stats. 2004, ch. 182, § 22, operative July 1, 2005; see now § 2034.010 et seq., added by Stats. 2004, ch. 182, § 23.) The trial court denied the continuance and the appellate court reversed, stating that "under the proper circumstances, the parties should be allowed to depose an expert who supplies a declaration or affidavit in support of or in opposition to summary judgment or summary adjudication where there is a legitimate

17

question regarding the foundation of the opinion of the expert." (*St. Mary*, at pp. 1537, 1540.)

The court reasoned that permitting limited discovery by the moving party will, in some circumstances, further the purpose of the summary judgment procedure, which is to dispose of actions that present no triable issues of material fact while avoiding mini-trials on the merits of those issues. (*St. Mary, supra*, 50 Cal.App.4th at pp. 1538, 1540.) Section 437c, subdivision (h), provides for continuances to allow further discovery by the opposing party, but there is no comparable provision for the moving party. (*St. Mary*, at pp. 1538–1539.) The moving party may generally depose witnesses before it decides to file a summary judgment motion, but it lacks that opportunity when the witness is an expert and there has not yet been a designation of experts under former section 2034. (*St. Mary*, at p. 1539.) To further the purpose of the summary judgment procedure, the court held, the trial court has discretion to allow additional discovery where there are "objective facts presented which create a significant question regarding the validity of the affidavit or declaration which, if successfully pursued, will impeach the foundational basis of the affidavit or declaration in question." (*Id.* at pp. 1540–1541.)

### 2.3. Analysis

The court did not abuse its discretion in finding that there were sufficient questions about the bases for Dr. Rand-Luby's opinions to bring this case within the rule of *St. Mary, supra*, 50 Cal.App.4th 1531. First, in setting forth her qualifications as an expert, Dr. Rand-Luby asserts that she treats patients with "conditions such as those suffered by Plaintiff" and "review[s] patient and hospital records concerning problems such as

18

Plaintiff's." It is unclear from this description which of Dee Ann's various "problems" and "conditions" Dr. Rand-Luby has ever treated. Her curriculum vitae, which is referenced in her declaration and attached thereto, indicates that Dr. Rand-Luby is a general surgeon with particular experience in breast and advanced laparoscopic surgery. Thus it is not obvious to what extent Dr. Rand-Luby's professional experience provides a foundation for her opinions about the qualifications of Mora's medical expert neurologist to render his opinions in this case, the purported absence of Mora's qualifications to treat Dee Ann in the first instance, and her opinion that Mora failed to meet the standard of care for a neurologist.

Second, Dr. Rand-Luby identified the foundation for her opinions in very general terms, citing voluminous medical records, laboratory test results, medical literature, and consultations with Infectious Disease Department physicians. But as to her specific opinions, she fails to identify the foundation for such statements as "[t]he medical record is purposefully misstated," Dee Ann's "symptoms were due to a long term infection as noted in her USC tests and records," and "there were lab reports, CT and MRI reports which were not normal, this is clearly set forth in the reports, which indicated the presence of a post surgical infection." Typically, an expert medical opinion would include, for example, details such as the date of a particular laboratory test result and explain why the specific indicators support the expert's opinion. Dr. Rand-Luby, however, offered only broad, conclusory statements. She also gave sweeping opinions such as "Defendant MORA was not qualified to treat Plaintiff's condition and lacked the experience to do so,"

19

without identifying any evidence that could form the basis of such an opinion.

These vagaries, and others, lead us to conclude that the court did not abuse its discretion in ordering a limited-scope deposition of Dr. Rand-Luby to allow Mora to inquire about the foundation of her opinions.

### 3. The court did not abuse its discretion by excluding Dr. Rand-Luby's declaration as an evidentiary sanction.

#### 3.1. Standard of Review

"We review the trial court's imposition of discovery sanctions for an abuse of discretion. (*Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 765; accord, *Britts v. Superior Court* (2006) 145 Cal.App.4th 1112, 1123 [abuse of discretion standard of review applies 'to review of an order imposing discovery sanctions for discovery misuse' unless 'the propriety of a discovery order turns on statutory interpretation'].) 'We view the entire record in the light most favorable to the court's ruling, and draw all reasonable inferences in support of it. [Citation.] … The trial court's decision will be reversed only "for manifest abuse exceeding the bounds of reason." ' (*Slesinger*, at p. 765; accord, *Los Defensores, Inc. v. Gomez* [(2014)] 223 Cal.App.4th [377], 390 [' " 'The power to impose discovery sanctions is a broad discretion subject to reversal only for arbitrary, capricious, or whimsical action.' " '].)" (*Sabetian v. Exxon Mobil Corp.* (2020) 57 Cal.App.5th 1054, 1084.)

#### 3.2. Legal Principles

Section 2023.030 authorizes a trial court to impose a range of penalties against "any party engaging in the misuse of the

discovery process," including monetary and evidence sanctions. (*Id*., subds. (a), (c)). As pertinent here, section 2023.010 provides that misuse of the discovery process includes "[f]ailing to respond or to submit to an authorized method of discovery" (*id*., subd. (d)), "[m]aking, without substantial justification, an unmeritorious objection to discovery" (*id*., subd. (e)), "[d]isobeying a court order to provide discovery" (*id*., subd. (g)), and "[m]aking or opposing, unsuccessfully and without substantial justification, a motion to compel or to limit discovery (*id*., subd. (h)). Evidentiary sanctions may be imposed only after a motion to compel has been made and granted and the party to be sanctioned has failed to comply with that order. (§ 2025.450, subd. (h).)

Concerning the proper scope of the sanction imposed, we note that "[d]iscovery sanctions must be tailored in order to remedy the offending party's discovery abuse, should not give the aggrieved party more than what it is entitled to, and should not be used to punish the offending party." (*Karlsson v. Ford Motor Co*. (2006) 140 Cal.App.4th 1202, 1217.)

### 3.3. Analysis

As described in detail *ante*, plaintiffs repeatedly misused the discovery process by refusing to produce Dr. Rand-Luby for a court-ordered deposition. The court issued at least two orders compelling her appearance, both of which plaintiffs refused to obey. And plaintiffs' second motion for a protective order was, in the court's words, "entirely frivolous." Thus, the statutory requirements for the imposition of an evidentiary sanction—misuse of the discovery process, granting of a motion to compel discovery, and violation of the court's resulting order—have been met.

Plaintiffs equate the evidentiary sanction to a terminating sanction and argue that the court erred in imposing that sanction because the court did not make the necessary findings, i.e., that plaintiffs willfully violated the court's discovery orders and acted without substantial justification, nor did the court impose a less severe sanction before imposing a terminating sanction, as is required. These arguments are misdirected because the court did not issue a terminating sanction. A terminating sanction consists of "(1) An order striking out the pleadings or parts of the pleadings of any party engaging in the misuse of the discovery process. [¶] (2) An order staying further proceedings by that party until an order for discovery is obeyed. [¶] (3) An order dismissing the action, or any part of the action, of that party. [¶] (4) An order rendering a judgment by default against that party." (§ 2023.030, subd. (d).) It is clear from the record that the court issued an evidentiary sanction, not a terminating sanction. The court did not, for example, strike plaintiffs' complaint or dismiss their action against Mora. The court did not even go so far as to strike plaintiffs' opposition to the motion for summary judgment in its entirety. Instead, it issued an evidentiary sanction striking Dr. Rand-Luby's declaration, which was narrowly tailored to address the dilatory conduct by plaintiffs and their counsel in obstructing her court-ordered deposition.

The fact that the sanction substantially impaired plaintiffs' ability to oppose Mora's summary judgment does not render the court's decision an abuse of discretion. "Absent some unusual extenuating circumstances not present here, the appropriate sanction when a party repeatedly and willfully fails to provide certain evidence to the opposing party as required by the discovery rules is preclusion of that evidence from the trial—even

if such a sanction proves determinative in terminating plaintiff's case. [Citation.] 'The *ratio decidendi* behind such cases,' a court has stated, is 'that a persistent refusal to comply with an order for the production of evidence is tantamount to an admission that the disobedient party really has no meritorious claim … .' [Citation.]" (*Juarez v. Boys Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 390, disapproved on an unrelated point by *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 222, fn. 9.)

Plaintiffs' only other argument is that Mora failed to establish adequate grounds to conduct an expert deposition under the doctrine stated in *St. Mary, supra*. But as we have said, the court did not abuse its discretion in ordering the deposition.

## 4. The court properly granted Mora's motion for summary judgment.

### 4.1. Standard of Review

The standard of review is well established. "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) The moving party "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Id*. at p. 850; § 437c, subd. (c).) The pleadings determine the issues to be addressed by a summary judgment motion. (*Metromedia, Inc. v. City of San Diego* (1980) 26 Cal.3d 848, 885, reversed on other grounds by *Metromedia, Inc. v. City of San Diego* (1981) 453 U.S. 490; *Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60, 74.)

On appeal from a summary judgment, we review the record de novo and independently determine whether triable issues of material fact exist. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) We resolve any evidentiary doubts or ambiguities in favor of the party opposing summary judgment. (*Saelzler,* at p. 768.) "In performing an independent review of the granting of summary judgment, we conduct the same procedure employed by the trial court. We examine (1) the pleadings to determine the elements of the claim, (2) the motion to determine if it establishes facts justifying judgment in the moving party's favor, and (3) the opposition—assuming movant has met its initial burden—to 'decide whether the opposing party has demonstrated the existence of a triable, material fact issue.' " (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 630.) "We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Ibid*.)

The appellant has the burden to show error, even if the appellant did not bear the burden in the trial court, and " 'to point out the triable issues the appellant claims are present by citation to the record and any supporting authority.' " (*Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th 224, 230.) Further, "an appellant must present argument and authorities on each point to which error is asserted or else the issue is waived." (*Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 867.) Matters not properly raised or that lack adequate legal discussion will be deemed forfeited. (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655–656.)

### 4.2. Legal Principles Regarding Professional Negligence

As the party with the ultimate burden at trial, plaintiffs would be required to establish medical negligence by proving "(1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." (*Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 305.)

With respect to the first element, the standard of care for medical professionals requires " ' "that a physician or surgeon have the degree of learning and skill ordinarily possessed by practitioners of the medical profession in the same locality and that he [or she] exercise *ordinary care* in applying such learning and skill to the treatment of [the] patient." [Citation.]' " (*Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 998, final brackets added; see also *Brown v. Colm* (1974) 11 Cal.3d 639, 642–643 [noting "a doctor is required to apply that degree of skill, knowledge and care ordinarily exercised by other members of his profession under similar circumstances"]; *McAlpine v. Norman* (2020) 51 Cal.App.5th 933, 938 [same].) "Proof of this standard is ordinarily provided by another physician, and if a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his [or her] knowledge goes to the weight of [the] testimony rather than to its admissibility." (*Brown*, at p. 643; *In re Roberto C.* (2012) 209 Cal.App.4th 1241, 1249.) Thus, the standard of care can ordinarily be proved only by expert testimony, " 'unless the conduct required by the particular

circumstances is within the common knowledge of the layman.' [Citations.]" (*Landeros v. Flood* (1976) 17 Cal.3d 399, 410.)

Proof of causation may also require expert testimony "[w]here the complexity of the causation issue is beyond common experience." (*Garbell v. Conejo Hardwoods, Inc.* (2011) 193 Cal.App.4th 1563, 1569; accord, *Webster v. Claremont Yoga* (2018) 26 Cal.App.5th 284, 290.) In a summary judgment proceeding, an expert's opinions may be rejected if they are conclusory, speculative, without foundation, or stated without sufficient certainty. (*Sanchez v. Kern Emergency Medical Transportation Corp.* (2017) 8 Cal.App.5th 146, 155–156 (*Sanchez*).)

### 4.3. Analysis

#### 4.3.1. Plaintiffs' Complaint

As noted, we first consider the allegations of plaintiffs' complaint to determine the scope of the issues. With respect to the professional negligence claim, plaintiffs contend Dee Ann was suffering from an infection during the time Mora was treating her and that Mora's failure to diagnose and treat the infection fell below the standard of care and caused or contributed to her injuries. These allegations sufficiently state a claim for professional negligence.

#### 4.3.2. Mora's Evidence

As the moving party, Mora had the initial burden to show that plaintiffs' claims have no merit—that is, that one or more elements of the cause of action cannot be established, or that there is a complete defense to that cause of action. (§ 437c, subd. (o); see *Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 945.) "If a defendant's moving papers make a prima facie

26

showing that justifies a judgment in its favor, the burden of production shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact." (*Jones*, at p. 945; *Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 965.)

Mora's motion for summary judgment addressed two elements of plaintiffs' negligence claim: standard of care and causation. As to the standard of care, Mora's expert neurologist, Dr. Gold, opined to a reasonable degree of medical certainty that Mora's treatment of Dee Ann met the standard of care. Specifically, Dr. Gold noted that Mora first consulted on Dee Ann's case on November 30, 2015, upon her second admission to a local hospital. At that time, Mora noted Dee Ann's prior surgery and post-surgical breakthrough seizures. Mora's differential diagnoses included stroke and Todd's paralysis (focal weakness following seizure.) None of Dee Ann's laboratory results or vital signs indicated the presence of an infection and her neck was supple, indicating no meningitis or infection of the lining of the brain. According to Dr. Gold, Mora ordered appropriate lab tests, medications to treat the seizures, and an MRI. The MRI performed on November 30, 2015, showed no evidence of an acute stroke or concerning signs of an infection. The imaging did show fluid collection near the surgical site, consistent with her postsurgical imaging study.

Mora continued to consult on Dee Ann's case and saw her daily until December 4, 2015. Some of Dee Ann's focal weakness had resolved by December 1, 2015, consistent with Mora's diagnosis of Todd's paralysis. Her white blood cell count and vital signs did not suggest an infection and her neck remained supple, i.e., not suggestive of an infection. Mora continued to treat

Dee Ann's seizures appropriately by ordering MRI and EEG studies as needed and adjusting or changing her antiseizure medications. According to Dr. Gold, a subsequent MRI performed on December 2, 2015 did not indicate the presence of an infection, nor did her vital signs or lab results.

Mora resumed his care and treatment of Dee Ann on December 7, 2015. Her vital signs and white blood count were normal and her neck was supple through December 10, 2015. Mora ordered another EEG which showed that Dee Ann's brain was irritated from the craniotomy and experiencing epileptiform changes. He continued to adjust her medication to address her ongoing seizure activity. Mora spoke to a colleague at USC Keck Medical Center and planned to transfer Dee Ann there because her symptoms were not resolving and that hospital had a dedicated specialty epilepsy team.

When Dee Ann arrived at USC, her neurological team was not initially concerned about infection as the possible cause of Dee Ann's condition, and they did not perform a lumbar puncture to evaluate the possibility of infection. According to the medical records, Dee Ann's treating physicians at USC did not consider infection until December 16, 2015. And even after a repeat craniotomy performed at USC revealed the presence of an infection, Dee Ann continued to have seizure activity that was not adequately controlled by medication.

In light of these facts, Dr. Gold concluded that Mora met the standard of care by properly assessing and diagnosing Dee Ann's condition relating to postsurgical seizures, ordering appropriate tests and prescribing anti-seizure medication, monitoring her brain activity, and modifying her medications as her condition changed. In sum, according to Dr. Gold, Dee Ann

did not exhibit any clinical signs of an infection prior to her transfer to USC Keck Medical Center and her symptoms were likely caused by brain irritation resulting from her craniotomy in October 2015.

As to causation, Dr. Gold also opined to a reasonable degree of medical certainty that nothing Mora did or did not do caused or contributed to Dee Ann's injuries. She suffered from seizures prior to, during, and after Mora's care and treatment and, to a reasonable medical probability, Dee Ann would have needed the same surgery and anti-epilepsy treatment at USC whether she did or did not have an infection while under Mora's care.

We agree with the court that Mora provided sufficient evidence to meet his initial burden of production with respect to the standard of care and causation regarding the professional negligence claim. And as we explain, plaintiffs' arguments to the contrary are unavailing.

Plaintiffs' main contention is that Mora failed to produce sufficient evidence to shift the burden of proof to them. For example, plaintiffs assert that Mora's separate statement did not "provide a proper basis for his request for summary judgment, and the Trial Court committed reversible error by allowing the motion to go forward when [Mora] clearly had not provided a competent statement of facts to support adjudication of the issues presented. Moreover, the separate statement was based upon the conclusory Declaration of Michael Gold, M.D." In a similar vein, plaintiffs suggest that "[t]he separate statement was not supported by competent evidence, but rather, by a self-serving Declaration consisting of hearsay and conclusions of law, which was patently insufficient to satisfy the evidentiary requirements of CCP § 437c, and shift the burden of proof to [plaintiffs]."

Plaintiffs also claim that Mora's separate statement was "conclusory and defective" as it "did not sufficiently state facts which would allow the Trial Court to render judgment on the allegations of the Complaint[ ] and contained only conclusions. The majority of the facts are legal opinions and conclusions as to ultimate facts. The separate statement should have been stricken as it does not comply with [section] 437c, [subdivision] (b)."

In asserting that Mora's motion for summary judgment was not supported by sufficient evidence, plaintiffs make only broad assertions that the evidence was incompetent, without any analysis of the evidence submitted by Mora. As discussed *ante*, however, Mora submitted a detailed declaration by an expert in neurology describing the clinical findings Mora made, his diagnoses of Todd's paralysis, the tests Mora ordered and the results they produced, as well as his monitoring of Dee Ann's condition and adjustment of anti-seizure medications. The expert's conclusions that Mora met the standard of care and did not cause or contribute to Dee Ann's injuries are well supported.[7] To show that such evidence failed to shift the burden to them, plaintiffs needed to do more than make bare assertions that the supporting evidence was incompetent. Instead, they were required to demonstrate through reasoned argument and

---

[7] Citing *Kelly v. Trunk* (1998) 66 Cal.App.4th 519, plaintiffs argue that "an expert's bare conclusion is insufficient to support summary judgment, just as it would be insufficient at trial." Indeed, that court stated that "an opinion unsupported by reasons or explanations does not establish the absence of a material fact issue for trial, as required for summary judgment." (*Id*. at p. 524.) This case is inapplicable with respect to Mora's expert, Dr. Gold, because he disclosed the materials relied upon as well as the factual bases and reasons for his opinions.

30

citations to relevant evidence and legal authority *why* the evidence was incompetent. (See *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799 (*Dietz*) [noting that if an appellant fails to support a claim with reasoned argument and citations to authority we may treat that claim as waived].) Plaintiffs utterly fail to do so.

Plaintiffs also contend the court erred by granting the motion for summary judgment because Mora "failed to show that [plaintiffs] could not establish each element of their prima facie case for Professional Negligence – Medical Malpractice by Physician." But Mora was not required to disprove *each* element of plaintiffs' negligence claim. It was sufficient to demonstrate that plaintiffs would be unable to establish *one* element of their claim. (§ 437c, subds. (o)(1) ["A cause of action has no merit if … [¶] [o]ne or more of the elements of the cause of action cannot be separately established … ."] & (p)(2) ["A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established … ."].)

Finally, plaintiffs argue that Mora's separate statement violated a rule of court and therefore his motion did not shift the burden to them. We reject this argument because plaintiffs provide no analysis of the facts and cite no applicable legal authority supporting their position. (See *Dietz, supra,* 177 Cal.App.4th at p. 799.)

### 4.3.3. Plaintiffs' Opposition

As noted, the only medical expert testimony supporting plaintiffs' opposition to Mora's motion for summary judgment was the declaration of Dr. Rand-Luby, which was stricken by the

31

court as an evidentiary sanction. The absence of a medical expert opinion in support of plaintiffs' opposition is fatal.

" 'Whenever the plaintiff claims negligence in the medical context, the plaintiff must present evidence from an expert that the defendant breached his or her duty to the plaintiff and that the breach caused the injury to the plaintiff.' [Citation] ' " 'When a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence.' " ' [Citation.]" (*Sanchez, supra*, 8 Cal.App.5th at p. 153.) Because Mora satisfied his initial burden and plaintiffs failed to submit any opposing medical expert evidence, Mora was entitled to summary judgment as a matter of law.

Plaintiffs' only response on this point is that Dr. Rand-Luby's declaration creates triable issues of material fact and the court erred by striking it. As we have already explained, however, the court's imposition of the evidentiary sanction was sound.

### 4.3.4. Because the negligence cause of action fails, the loss of consortium claim also fails.

It is well-settled that "an unsuccessful personal injury suit by the physically injured spouse acts as an estoppel that bars the spouse who would claim damages for loss of consortium." (*Meighan v. Shore* (1995) 34 Cal.App.4th 1025, 1034–1035; see also *Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1315–1316; Haning et al., Cal. Practice Guide: Personal Injury, ¶ 3:2413.) Because we conclude plaintiffs' negligence cause of action fails, we must also conclude the cause of action for loss of consortium fails.

5. **The court did not abuse its discretion by awarding Mora ex parte application fees and expert witness fees as costs under section 998.**

### 5.1. Standard of Review

Generally, the prevailing party in civil litigation has the right to recover costs enumerated by statute and other costs reasonably necessary to the litigation and reasonable in amount. (§§ 1032, 1033.5.) " 'Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion. [Citation.] However, because the right to costs is governed strictly by statute [citation] a court has no discretion to award costs not statutorily authorized. [Citations.]' [Citation.] Whether a cost is statutorily authorized is a question of law we review de novo. [Citation.]" (*Naser v. Lakeridge Athletic Club* (2014) 227 Cal.App.4th 571, 575–576.)

### 5.2. Plaintiffs' Arguments

### 5.2.1. Striking the Cost Memorandum

Plaintiffs argue the court erred by refusing to strike Mora's cost memorandum in its entirety. As we understand their cursory argument, plaintiffs asked the court to strike the cost memorandum because it claimed $420 in costs that had previously been awarded to Mora as a sanction and had already been paid by plaintiffs.[8] Because the cost memorandum included this item, plaintiffs claim the memorandum was "patently false, and the Trial Court should have stricken it in its entirety."

---

[8] Mora acknowledged the issue and withdrew the request for costs that had already been paid.

Plaintiffs cite California Rules of Court, rule 3.1700, which provides that a cost memorandum must be verified by a party, attorney, or agent, stating that "to the best of his or her knowledge the items of cost are correct and were necessarily incurred in the case." (Cal. Rules of Court, rule 3.1700(a)(1).) Of course, the cost memorandum *was* verified.

Plaintiffs' only cited authority makes no provision for the remedy they seek. And as they have provided no other relevant authority or discernable legal argument, we reject their argument without further discussion. (See *Dietz, supra*, 177 Cal.App.4th at p. 799.)

### 5.2.2. Ex Parte Application Filing Fees

Plaintiffs also contend the court abused its discretion by awarding Mora filing fees relating to multiple ex parte applications to continue his motion for summary judgment. Plaintiffs assert that the ex parte applications were not reasonably necessary to the litigation because plaintiffs had previously stipulated to continuances on four occasions.

Mora's cost memorandum includes filing fees relating to three ex parte applications, each of which appears to request a continuance of the motion for summary judgment. In two of those applications, however, Mora not only sought a continuance but also requested an order compelling plaintiffs to produce Dr. Rand-Luby for deposition. The court concluded it was reasonable for Mora to seek relief by ex parte application due to "plaintiffs' intransigence in refusing to allow the deposition of their expert, Dr. Leslie Rand-Luby[.]" In light of the degree to which plaintiffs and their counsel flouted their discovery obligations, we see no abuse of discretion in the court's ruling. And as to the remaining ex parte application, plaintiffs have not

included the application in the record on appeal. They have therefore forfeited the issue by failing to provide a sufficient record for review (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295 [failure to provide an adequate record requires that the issue be resolved against the appellant].)

### 5.2.3. Expert Fees as Costs under Section 998

Finally, plaintiffs challenge the court's award of expert witness fees under section 998.

On May 13, 2019, Mora made written offers to settle with each of the plaintiffs individually for a waiver of costs (including sanctions) in exchange for a dismissal with prejudice. Plaintiffs refused the offers. In his cost memorandum, Mora sought expert witness fees of $8,637.33 as costs under section 998.

Recoverable costs do not typically include the fees of expert witnesses not ordered by the court. (§§ 1032, 1033.5, subd. (b)(1).) But those fees are recoverable as costs where, as here, a more favorable judgment for the defendant follows a plaintiff's rejection of a valid pretrial section 998 settlement offer. As relevant here, section 998 provides: "(c)(1) If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award … in any action or proceeding …, the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover postoffer costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant."

Plaintiffs challenge the award of expert fees as costs on two grounds. First, plaintiffs argue that Mora is not entitled to expert witness fees under section 998 because he did not attach copies of

his written settlement offers to his cost memorandum. Plaintiffs are wrong. As noted *ante*, a memorandum of costs must be "verified by a statement of the party, attorney, or agent that to the best of his or her knowledge the items of cost are correct and were necessarily incurred in the case." (Cal. Rules of Court, rule 3.1700(a)(1).) The verification provides prima facie evidence that the costs were reasonably incurred. Supporting documentation must be submitted only if costs have been put in issue by a motion to tax costs. (See *Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1265, 1267.) Mora submitted copies of the settlement offers to the court at the appropriate time, i.e., with his opposition to plaintiffs' motion to tax costs, which put the expert witness fees at issue.[9]

Second, plaintiffs contend that Mora's settlement offers were so premature and unreasonably low as to be invalid. As plaintiffs correctly note, "[t]o be valid, a section 998 offer must be made in good faith, which requires that the offer of settlement be

---

[9] Citing *Behr v. Redmond* (2011) 193 Cal.App.4th 517, plaintiffs claim Mora "was required to provide the Trial Court with evidence of a written offer to compromise, within the time permitted to file his memorandum of costs, in order for the Trial Court to be able to make a determination as to whether expert fees can be recovered." The case does not so hold. Although it is somewhat unclear from the opinion, it appears the prevailing party sought to recover expert witness fees under section 998. The opposing party challenged that item in a motion to tax costs but the court denied the motion. On appeal, the prevailing party conceded that the request for expert witness fees as costs was not supported by evidence of a written settlement offer and the court of appeal therefore reversed the award due to the lack of supporting evidence. (*Behr,* at p. 538.) The case is distinguishable because here, Mora did submit evidence of the written settlement offers.

' "realistically reasonable under the circumstances of the particular case. …" ' [Citations.] A token or nominal offer made with no reasonable prospect of acceptance will not pass the good faith test. [Citation.] '[W]hen a party obtains a judgment more favorable than its pretrial offer, [the offer] is presumed to have been reasonable and the opposing party bears the burden of showing otherwise.' [Citations.]" (*Essex Ins. Co. v. Heck* (2010) 186 Cal.App.4th 1513, 1528 (*Essex*).)

" ' "Whether a section 998 offer was reasonable and made in good faith is left to the sound discretion of the trial court." [Citation.] "In reviewing an award of costs and fees under … section 998, the appellate court will examine the circumstances of the case to determine if the trial court abused its discretion in evaluating the reasonableness of the offer or its refusal." [Citation.] " ' ["]The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power." [Citations.]' " [Citation.]' [Citation.]" (*Essex, supra*, 186 Cal.App.4th at pp. 1528–1529.)

The court concluded Mora's settlement offers were reasonable under the circumstances. Noting that the offers were made two and a half years after plaintiffs filed their complaint, the court rejected plaintiffs' argument that the offers were premature. Further, Mora's offers were accompanied by a letter disclosing to plaintiffs that Mora's experts had determined that he met the standard of care and did not cause Dee Ann's injuries. By that point, the court found, plaintiffs had had the opportunity to evaluate the strength of their case and obtain their own expert

opinion regarding Mora's liability. Further, the court found that the offer to waive costs was not unreasonably low: "Indeed, it is hard to ignore that defendant Mora's motion for summary judgment was granted as a direct result of plaintiffs' decision not to make their expert available for deposition as ordered by the Court. Given the multiple opportunities plaintiffs were afforded to comply with the Court's order to produce their expert Dr. Rand-Luby for deposition, it is reasonable to infer plaintiffs decided not to do so because they well knew that expert could not provide evidence to raise a disputed issue as to Dr. Mora's liability."

We see no abuse of discretion in the court's ruling. Courts have held that a settlement offer of a waiver of costs can have significant monetary value, as it does here. (See *Jones v. Dumrichob, supra*, 63 Cal.App.4th at p. 1264 [noting a party's exposure to costs can be substantial].) And the fact that Mora prevailed on the motion for summary judgment is prima facie evidence that his settlement offer was reasonable. (See, e.g., *Essex, supra*, 186 Cal.App.4th at p. 1528 [noting that " '[w]hen a party obtains a judgment more favorable than its pretrial offer, [the offer] is presumed to have been reasonable' "].)

Plaintiffs fail to demonstrate a clear abuse of discretion. Citing *Pineda v. Los Angeles Turf Club, Inc.* (1980) 112 Cal.App.3d 53 (*Pineda*), plaintiffs contend that Mora's settlement offers were invalid because they were "premature," "illusory, and patently unreasonable." Specifically, plaintiffs note that Mora served his settlement offers in May 2019, before he had incurred any expert witness fees, and on that basis they argue that "the offers were clearly illusory, token offers designed solely to make [Mora] 'eligible for the recovery of large expert witness fees at no

real risk.' " Further, plaintiffs claim that offering a waiver of costs as a settlement "at the point of litigation where no expert fees have been incurred renders the offer illusory, token and patently invalid."

*Pineda* involved the wrongful death of a jockey due to a head injury sustained at the Santa Anita racetrack. One of the defendants manufactured the helmet the decedent wore, and plaintiffs contended the helmet was defectively designed and manufactured. (*Pineda, supra,* 112 Cal.App.3d at p. 56.) Apparently, the trier of fact determined that the manufacturer was not liable. The manufacturer had offered the plaintiffs $2,500 to settle the case about a month prior to trial and they declined. The manufacturer then requested expert witness fees as costs under section 998. But the court denied the request, saying that the offer was unreasonable and not made in good faith. (*Pineda,* at pp. 62–63.) The court's explanation of its ruling was brief: " 'I don't feel that [the manufacturer's] offer was a realistic offer in this case and the expert witness fees will be denied.' When questioned by Mr. Davis, counsel for [the manufacturer], concerning the basis of its ruling, the court reiterated, 'I feel, under the circumstances, it was not a good faith offer and I am exercising my discretion and I am going to disallow those costs. That is final.' " (*Id.* at p. 63.)

The appellate court concluded that the court did not abuse its discretion. "Under the circumstances of this case[,] the trial court had ample reason to find that the offer was not reasonable. Although [the manufacturer's] liability was tenuous indeed, having in mind the enormous exposure the trial court could find that [the manufacturer] had no expectation that its offer would be accepted. From this it follows that the sole purpose of the offer

was to make [the manufacturer] eligible for the recovery of large expert witness fees at no real risk." (*Pineda, supra,* 112 Cal.App.3d at p. 63.)

It is evident that the court's analysis in *Pineda* was fact-specific and therefore provides little guidance in the present case. But at a minimum, the case does not stand for the proposition plaintiffs advance, namely, that the service of a settlement offer prior to incurring substantial expert fees is necessarily an "illusory" and "token" offer that will not support an award of expert fees as costs under section 998.

Plaintiffs also suggest that the offer of a waiver of costs was invalid because Dee Ann's medical expenses exceeded $1.2 million, citing *Pineda* and *Wear v. Calderon* (1981) 121 Cal.App.3d 818, 821 (*Wear*).

In *Wear*, after a judgment in favor of the defendant, the trial court awarded the defendant costs including expert witness fees based on the plaintiff's pretrial rejection of the defendant's section 998 compromise offer of $1. The Court of Appeal deleted the award of expert witness fees from the cost award and affirmed the modified judgment. In so doing, the court determined that a section 998 offer must be made in good faith. (*Wear, supra*, 121 Cal.App.3d at p. 821.) Because it appeared, on the particular circumstances of the case, that the defendant made the offer for the sole purpose of later recovering large expert witness fees, the court concluded that the $1 settlement offer did not satisfy the good faith requirement. (*Id*. at p. 822.)

Plaintiffs cite no facts indicating that Mora acted in bad faith or made his settlement offer solely for the purpose of later recovering expert witness fees. As noted, the settlement offers sent to plaintiffs disclosed that Mora's experts had concluded that

40

Mora did not breach the standard of care or cause Dee Ann's injuries. In other words, Mora had a reasonable belief that he would prevail in the litigation and it was therefore reasonable to offer to settle the case for a relatively low amount. In the absence of evidence to the contrary, we see no abuse of discretion in the court's conclusion that Mora acted in good faith.

## DISPOSITION

The judgment and order awarding costs are affirmed. Respondent Jeffrey Mora shall recover his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.

41